# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Wiko phone<br>Seized as FP&F No. 20202506000060602 002 | ) ) ) ) ) ) Case No.   20MJ1885 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, U.S.C. sec. 952, 960, 963 | Importation of a Controlled Substance (methamphetamine) |

The application is based on these facts:
See Attached Affidavit of Homeland Security Investigations (HSI) Special Agent Anthony Lyons, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Anthony Lyons*
Applicant's signature

Special Agent Anthony Lyons, HSI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: May 19, 2020

*[Judge's signature]*
Judge's signature

City and state: San Diego, California

Hon. Bernard G. Skomal, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Special Agent Anthony Lyons, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

>Grey LG phone
>Seized as FP&F No. 2020250600060601 002
>("Target Device 01")

>Black Wiko phone
>Seized as FP&F No. 20202506000060602 002
>("Target Device 02," and collectively the "Target Devices")

as further described in Attachment A and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960 and 963 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Eliodoro TAPIA and Candice ROBLES ("the Defendants") for importing approximately 11.12 kilograms (21.52 pounds) of Methamphetamine from Mexico into the United States. The Target Devices are currently in the custody of Homeland Security Investigations and located at 880 Front Street, San Diego, CA 92101.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since December 2010. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the

1

Federal Law Enforcement Training Center in Glynco, Georgia. Prior to HSI, I was employed as an Officer with Customs and Border Protection since 2006.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles that enter the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual ("the driver") responsible for driving the vehicle containing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the driver regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the driver to remotely monitor the progress of the narcotics, provide instructions to the driver and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the driver to provide further instructions regarding the transportation of the narcotics to a destination within the United States.

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions

set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

    a. tending to indicate efforts to import controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

7. On May 6, 2020, at approximately 6:05 p.m., defendant Eliodoro TAPIA ("TAPIA"), a U.S. citizen, applied for entry into the United States from Mexico through the Otay Mesa, California, Port of Entry in vehicle lane #8. TAPIA was the driver of a 2020 Toyota RAV 4 bearing Nevada license plate 776L12 ("the vehicle"). This vehicle

3

was a rental. Candice ROBLES, a seventeen-year-old minor, was a passenger in the vehicle.

8. Customs and Border Protection Officer ("CBPO") J. Dubski was conducting primary operations at vehicle lane # 8 and obtained oral declarations of U.S. Citizenship from each of the passengers. CBPO Dubski obtained two negative declarations from TAPIA. TAPIA stated that he was in Mexico picking up ROBLES who was stranded in Mexico. CBPO Dubski found this suspicious because he noted that ROBLES crossed the border earlier in the day and could not understand how she would be stranded. Upon inspecting the vehicle, CBPO Dubski found some five-gallon paint containers in the back of the vehicle which made him suspicious as these items seemed out of place. CBPO Dubski referred the vehicle to secondary for further inspection.

9. CBPO M. Goodwin was assigned to the Z Portal X-Ray Machine and assigned to screen the vehicle. CBPO Goodwin analyzed the scans of the vehicle and discovered anomalies in paint buckets located in the cargo area of the vehicle. CBPO Goodwin notified secondary of the anomalies.

10. CBPO C. Vo was assigned to conduct a patdown and examination of ROBLES person and belongings. During inspection of ROBLES' purse, CBPO Vo discovered several plastic baggies containing a white powdery substance that tested positive for Methamphetamine.

11. CBPO J. Poblete was assigned as the seizing officer and tasked with removing the suspected narcotics from the vehicle and to conduct a total examination of the vehicle. In total, CBPO Poblete removed seven (7) packages from the paint buckets. With the assistance of Supervisory CBPO Tobin, CBPO Poblete probed a random package which field-tested positive for the properties of methamphetamine. The combined weight of the packages believed to contain methamphetamine was approximately 11.12 kilograms (21.52 pounds).

12. The combined weight of the packages believed to contain Methamphetamine

4

that were discovered inside of ROBLES' purse was approximately 14.4 grams (0.03 pounds).

13. At approximately 10:30 p.m., HSI Special Agent A. Lyons and M. Roman interviewed TAPIA. TAPIA agreed to waive his Miranda rights and speak with Agents without the presence of an attorney.  During the interview, TAPIA stated that he was asked by a friend to drive the friend's rental car down to Tijuana to pick up ROBLES at a Costco. Upon arriving at Costco, TAPIA left the vehicle unattended for 10 minutes, while locking the vehicle and taking the keys with him. TAPIA returned to the vehicle after retrieving ROBLES and they departed to Otay Mesa Port of Entry to return to the U.S. without making any other stops. TAPIA stated that they smoked methamphetamine while in the queue to enter the U.S. via the Otay Mesa Port of Entry.  TAPIA denied knowledge of the methamphetamine found in the paint buckets.

14. TAPIA was arrested and charged with a violation of Title 21, United States Code, 952 and 960, importation of a controlled substance, and was scheduled to be booked into the Metropolitan Correctional Center. ROBLES was released to the custody of her mother.

15. Target Device 01 was found in the center console of the vehicle and was seized at the time of arrest. During the interview, Defendant TAPIA was shown Target Device 01 and identified the Target Device 01 as belonging to him.

16. Target Device 02 was found in Defendant ROBLES belongings and was seized at the time of arrest. During the interview, Defendant ROBLES was shown Target Device 02 and identified Target Device 02 as belonging to her.

17. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the Target Devices.  In light of the above facts and my experience and training, there is probable cause to believe that The Defendants were

5

using the Target Devices to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as The Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Devices for data beginning on April 6, 2020, up to and including May 7, 2020.

## METHODOLOGY

18. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic

data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

19. Following the issuance of this warrant, I will collect the Target Devices and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

20. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

21. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

22. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of The Defendants' violations of Title 21, United States Code, Sections 952, 960 and 963. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

1 | I swear the foregoing is true and correct to the best of my knowledge and belief.

*Anthony Lyons*
Special Agent Anthony Lyons
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __19__ day of May, 2020.

_____
Honorable Bernard G. Skomal
United States Magistrate Judge

8

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Grey LG phone
>
>Seized as FP&F No. 2020250600060601 002
>
>("Target Device 01")
>
>Black Wiko phone
>
>Seized as FP&F No. 20202506000060602 002
>
>("Target Device 02")

The Target Devices are currently in the custody of *Homeland Security Investigations* and located at *880 Front Street, San Diego, CA 92101*.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 6, 2020, up to and including May 7, 2020:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of Methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.